**2020 IL 123975**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 123975)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
TAVARIUS D. RADFORD, Appellant.

*Opinion filed June 18, 2020.*

JUSTICE THEIS delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Kilbride, Garman, and Karmeier concurred in the judgment and opinion.

Justice Neville dissented, with opinion.

Justice Michael J. Burke took no part in the decision.

## OPINION

¶ 1     Following the death of his 26-month-old daughter, M.R., from traumatic brain injuries, defendant Tavarius D. Radford was found guilty of endangering the life or

health of a child (720 ILCS 5/12-21.6(a) (West 2010)) after a jury trial in the circuit court of Kankakee County. On appeal, defendant's conviction and sentence were affirmed. 2018 IL App (3d) 140404. The appellate court found, *inter alia*, that the trial court did not violate his right to a public trial by partially closing the courtroom during jury selection and that no error occurred when the jury was instructed. *Id.* ¶¶ 47, 60. For the reasons that follow, we affirm the judgment of the appellate court.

¶ 2                                    BACKGROUND

¶ 3        On December 5, 2011, defendant was charged by indictment with first degree murder (720 ILCS 5/9-1(a)(2) (West 2010)) and endangering the life or health of a child (*id.* § 12-21.6(a)).

¶ 4        Two years later, this case proceeded to a jury trial. On November 18 and 19, 2013, jury selection occurred. Prior to *voir dire*, the trial court recognized that jury selection is a public proceeding but that the courtroom could not accommodate all the potential jurors and spectators present for the proceeding.[1] The trial court explained:

> "What I'm go[ing to] do during jury selection, it's go[ing to] be difficult— it's a public proceeding, jury selection, but here's the problem. There's only so many seats \*\*\*. \*\*\* [The] courtroom appears to be divided \*\*\* between perhaps people here in support of the defendant and individuals here more or less \*\*\* not in support of the defendant, and I will allow two individuals from the victim's family and two individuals from the defendant's family to be present during jury selection and there may not even be room for you, but you cannot talk to any particular \*\*\* jurors. You'll have to sit at the back of the courtroom, not as an insult to you, but in recognition of the fact that we are about to go into jury selection and the emphasis is going to be on the jurors. Okay?
>
> Also, if you are behind the jurors \*\*\* there's less risk that you might inadvertently \*\*\* you wouldn't have like some sort of facial expression to

---

[1]The venire consisted of approximately 100 members. A larger pool of potential jurors was considered necessary because the trial was anticipated to last about two weeks, would start before the Thanksgiving holiday, and there were approximately 50 potential witnesses that could be called.

something that's said that could potentially influence the jurors. We don't want that to happen. Okay?

*** I want to commend everybody in the courtroom *** for your patience *** and your demeanor, and I'm go[ing to] ask that throughout the trial which could involve, obviously, considering the nature of the case emotions running high. I'm go[ing to] appreciate it if you remember that it's inappropriate to display those emotions because that can have an [e]ffect on the jury and it can *** affect *** whether or not the trial is ultimately able to even take place or whether or not a mistrial would have to occur, and nobody wants to see that happen. Okay?

So at this time we're go[ing to] bring the jurors up. I am going to clear the courtroom with the exception of the two people from each side ***."

¶ 5    Neither party objected to the trial court's approach. Both parties complied with the trial court's request and chose the two family members who were allowed to remain in the courtroom while the jury was selected.

¶ 6    On the second day of jury selection, before bringing out the second panel of prospective jurors, the trial court reminded the members of the public who were present of its prior decision to permit only two individuals associated with each side to sit in the courtroom.

¶ 7    The trial court also informed the parties and the prospective jurors of the following:

"I do want to point out, ladies and gentlemen, that this is a case in which *** a request for media coverage was granted and you may or may not notice that there is a camera in the courtroom. Under the rules in which the media have—are allowed to film and photograph proceedings, jurors are not permitted to be photographed or filmed. Okay. Just want you to know that."[2]

---

[2]On November 20, 2013, as the State recognizes in its brief, a photograph of defendant and his attorney appeared in a local newspaper referencing that it had been taken in the courtroom during the second day of jury selection. See Dimtrios Kalantzis, *Kankakee Murder Trial Puts Mother of Victim on Stand*, Kankakee Daily J. (Nov. 20, 2013), https://www.daily-journal.com/news/local/

¶ 8        After jury selection was completed, the trial court informed the jurors again of its decision to grant media coverage. The court allowed both family members and members of the general public to be present in the courtroom for the remainder of the proceedings.

¶ 9        The trial evidence showed that on October 26, 2011, at approximately 10 a.m., Kayleigh Reardanz found her daughter, M.R., unresponsive in the apartment that she and defendant shared with Cheryl and David Heather and Kimberly and Echo Brewington. David attempted unsuccessfully to resuscitate M.R. while they waited for an ambulance. At the hospital, M.R. was pronounced dead. Dr. Valerie Arangelovich, a forensic pathologist, performed the autopsy. She opined that M.R.'s death was caused by cerebral injury due to blunt head trauma from child abuse.

¶ 10       In early 2011, M.R. had fallen and hit her head while defendant was babysitting. He took M.R. to the emergency room. M.R.'s CAT scans were negative, and she was discharged. Kayleigh testified that weeks later, while her friend was babysitting, M.R. fell and "split her eyebrow open." Thereafter, in April 2011, M.R. slipped in Kayleigh's mother's bathtub and "busted her chin." Each time, M.R. was taken to the hospital for medical treatment.

¶ 11       On October 22, 2011, M.R. and Kayleigh were outside playing when M.R. fell and hit her head on the pavement. She examined M.R.'s head but saw no injury. Kayleigh further testified of a second fall prior to M.R.'s death. During a tantrum, M.R. threw herself backward and hit her head on the parking lot pavement. Kayleigh testified that while M.R. was later getting her hair styled, she complained of pain in the back of her head. She examined M.R.'s head but did not see any sign of injury. Kayleigh testified that the second fall occurred the day prior to M.R.'s death but later testified that she was uncertain as to the exact date, while Echo testified that it was three days prior to the death.

¶ 12       Defendant was 17 years old at the time of M.R.'s death. He did not testify at trial. The jury, however, viewed his videotaped police interview. He told police that on the afternoon of October 25, 2011, he tucked M.R. into a daybed to take a nap.

kankakee-murder-trial-puts-mother-of-victim-on-stand/article_3ba1ca0f-73e5-5725-bd85-2068ff6e53e5 html [https://perma.cc/4Q2C-7NLL] (photograph by Mike Voss).

- 4 -

A few minutes later he checked on her and discovered that, instead of sleeping, she was playing with a wooden unicorn plaque. Defendant was upset that she was not sleeping and tucked her back into bed. He grabbed her by the arms and pushed her from a sitting position onto her back. He speculated that she may have hit her head on the wooden plaque. Using a stuffed bear, defendant demonstrated for police how he forcefully tucked her back into bed. He told police that the demonstration was less aggressive than how he actually tucked M.R. back into bed.

¶ 13 Kayleigh testified that she returned home from work around 11 p.m. on October 25. She later noticed M.R. whimpering and rubbing her feet together. M.R. indicated to her mother that she was not in pain. Kayleigh discovered M.R. unresponsive the next morning.

¶ 14 Two experts presented conflicting testimony regarding the manner of M.R.'s death. Dr. Arangelovich opined that M.R.'s death was caused by blunt head trauma from child abuse. Dr. Arangelovich observed subgaleal and subdural hemorrhages in the back of M.R.'s head. She testified that the accidental falls M.R. experienced prior to her death could have caused the subgaleal hemorrhages but that those hemorrhages did not cause the baby's death. According to Dr. Arangelovich, the fatal injury was the subdural hemorrhage, which she opined occurred within 24 hours of M.R.'s death.

¶ 15 Dr. Shaku Teas, a forensic pathologist, believed that M.R.'s head injuries were consistent with the accidental falls she experienced prior to her death and opined that the injuries she sustained in those falls caused her death. Like Dr. Arangelovich, she believed that the subdural injuries directly caused the death. According to Dr. Teas, however, M.R.'s subdural hemorrhage was caused by an injury that she sustained more than 24 hours prior to her death.

¶ 16 Following closing arguments, the trial court instructed the jury, *inter alia*, that the offense of endangering the life or health of a child required proof that defendant had care or custody of M.R., that he willfully caused or permitted M.R.'s life to be endangered, and that his acts proximately caused her death.

¶ 17 The jury acquitted defendant of murder and involuntary manslaughter, but it convicted him of endangering the life or health of a child. The trial court sentenced defendant to 42 months in prison.

¶ 18    The appellate court, with one justice dissenting, affirmed his conviction and sentence. 2018 IL App (3d) 140404, ¶ 62. The appellate court majority concluded that (1) the circuit court's partial closure of the courtroom during jury selection did not constitute clear or obvious error, was a "trivial closure," and was not reviewable as second-prong plain error (*id.* ¶¶ 59-60); (2) no error occurred when the jury was instructed regarding the mental state for the offense of child endangerment (*id.* ¶¶ 46-47); and (3) the jury could reasonably conclude based upon the evidence that defendant willfully endangered M.R.'s life or health (*id.* ¶ 40). The dissenting justice maintained that the circuit court's exclusion of all but four members of the public during jury selection was not trivial and constituted second-prong plain error. *Id.* ¶¶ 69, 77 (McDade J., dissenting).

¶ 19    This court allowed defendant's petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff. July 1, 2018).

¶ 20                                  ANALYSIS

¶ 21                      I. Partial Closure of the Courtroom

¶ 22    Defendant contends that the trial court violated his sixth amendment right to a public trial by partially closing the courtroom during jury selection. See U.S. Const., amend. VI. Defendant concedes that he did not object to the closure and did not raise the issue in a posttrial motion. He therefore seeks plain-error review.

¶ 23    Our plain-error doctrine allows a reviewing court to consider unpreserved error when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). A reviewing court also may consider unpreserved error when a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Id.* Defendant contends that his failure to preserve his claim should be excused because it constitutes second-prong plain error.

¶ 24    We first must determine whether the trial court's partial closure of the courtroom in this case amounted to clear or obvious error by depriving him of the right to a public trial.

¶ 25    The sixth amendment to the federal constitution provides an accused with the right to a public trial. U.S. Const., amend. VI. The United States Supreme Court has recognized that the protections conferred by the public trial guarantee are to (1) ensure a fair trial, (2) remind the prosecutor and judge of their responsibility to the accused and the importance of their functions, (3) encourage witnesses to come forward, and (4) discourage perjury. *Waller v. Georgia*, 467 U.S. 39, 46 (1984). Trial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials. *Presley v. Georgia*, 558 U.S. 209, 215 (2010) (*per curiam*). The right to a public trial additionally protects some interests that do not belong solely to the defendant. *Weaver v. Massachusetts*, 582 U.S. ___, ___, 137 S. Ct. 1899, 1910 (2017). The right to an open courtroom also protects the rights of the public at large and the press. *Id.* at ___, 137 S. Ct. at 1910; see also *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 508-10 (1984). The public trial right extends to jury selection. *Presley*, 558 U.S. at 213.

¶ 26    Defendant contends that the trial court committed clear and obvious error when it partially closed the courtroom without his "consent" during jury selection. He argues that the court failed to provide an adequate justification for its decision beyond recognizing a need to use a larger pool of prospective jurors than normal and to seat them all at the same time. Defendant claims that, because the trial court's closure does not satisfy *Waller*'s four factor "overriding interest test," he is automatically entitled to a new trial.

¶ 27    In *Waller*, the state court ordered a weeklong suppression hearing closed to all persons other than witnesses, court personnel, the parties, and the lawyers. *Waller*, 467 U.S. at 42. The trial court overruled the defendants' objections to the closure of the courtroom. Upon review, the Supreme Court instructed that "under the Sixth Amendment any closure of a suppression hearing *over the objections of the accused* must meet the" following tests:

"the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to

closing the proceeding, and it must make findings adequate to support the closure." (Emphasis added.) *Id.* at 47-48.

See also *Presley*, 558 U.S. at 214 (holding that these standards apply before excluding the public from any stage of a criminal trial).

¶ 28 Although the Supreme Court recognized that there would be instances where closure was justified, it noted that "such circumstances will be rare" and ruled that the closure in question was unjustified. *Waller*, 467 U.S. at 45, 48. The *Waller* Court therefore ordered a new suppression hearing that was open to the public. If the same evidence was found admissible in that renewed pretrial proceeding, the Court held that no new trial as to guilt would be necessary, as a new trial would presumably be a windfall for the defendant and not in the public interest. *Id.* at 49-50.

¶ 29 The Court further recognized that only four of the five defendants in *Waller* had lodged an objection to closing the hearing. *Id.* at 42 n.2. Consequently, it instructed the state court to determine on remand whether the remaining defendant was procedurally barred from seeking relief as a matter of state law. *Id.* at 42 n.2.

¶ 30 Thereafter, in *Presley*, the courtroom, in contrast to the instant case, was completely closed to the public during jury selection. *Presley*, 558 U.S. at 210. In further contrast to this case, the defendant in *Presley* objected to the trial court's closure. *Id.* On review of the state supreme court's decision allowing the closure, the Court observed that the state court's reasoning for the closure would allow a courtroom to be closed during jury selection " 'whenever the trial judge decides, for whatever reason, that he or she would prefer to fill the courtroom with potential jurors rather than spectators.' " *Id.* at 215 (quoting *Presley v. State*, 674 S.E.2d 909, 913 (Ga. 2009) (Sears, C.J., dissenting, joined by Hunstein, P.J.)). Although the Court expressly noted that courtroom closure may be ordered in some circumstances, the Court stated that it was "still incumbent upon" the trial court "to consider all reasonable alternatives to closure." *Id.* at 215-16.

¶ 31 Most recently, in *Weaver*, the trial court excluded from the courtroom any member of the public who was not a potential juror for the two days of jury selection. *Weaver*, 582 U.S. at ___, 137 S. Ct. at 1906. The exclusion included the defendant's mother and his minister, who were turned away when they attempted

to attend the jury selection. *Id.* at \_\_\_, 137 S. Ct. at 1906. As in this case, defense counsel did not object to the closure. *Id.* at \_\_\_, 137 S. Ct. at 1906. Five years after the defendant's conviction, he filed a motion for a new trial in state court, arguing that his attorney had provided ineffective assistance by failing to object to the courtroom closure. *Id.* at \_\_\_, 137 S. Ct. at 1906. The trial court ruled that he was not entitled to relief. *Id.* at \_\_\_, 137 S. Ct. at 1906.

¶ 32 The Court ultimately affirmed, holding that in the context of a public-trial violation during jury selection, where the error is neither preserved nor raised on direct review but is brought later via an ineffective assistance of counsel claim, a defendant must demonstrate prejudice to secure a new trial. *Id.* at \_\_\_, 137 S. Ct. at 1910-11. Because the defendant had offered no evidence or legal argument that the outcome of his case likely would have differed had the courtroom not been fully closed to the public, he could not prevail on his claim. *Id.* at \_\_\_, 137 S. Ct. at 1912-13.

¶ 33 The Court in *Weaver* reiterated its jurisprudence that not every courtroom closure results in an unfair trial, nor does each closure affect the values underlying the sixth amendment's public trial guarantee. *Id.* at \_\_\_, 137 S. Ct. at 1909-10. The Court stated that its precedent teaches that courtroom closure is to be avoided but that there are some circumstances when it is justified. *Id.* at \_\_\_, 137 S. Ct. at 1909. The problems that trial courts encounter in deciding whether closures are necessary, or even deciding which members of the public to admit when seats are scarce, are difficult ones. *Id.* at \_\_\_, 137 S. Ct. at 1909. The Court provided, as an example, that a judge may want to give preliminary instructions to the venire as a whole, rather than repeating those instructions, perhaps with unintentional differences, to several groups of potential jurors. On the other hand, various constituencies of the public—the family of the accused, the family of the victim, and members of the press, among others—all have interests in observing the selection of jurors. *Id.* at \_\_\_, 137 S. Ct. at 1909. How best for a trial court "to manage these problems is not a topic discussed at length in any decision or commentary the Court has found." *Id.* at \_\_\_, 137 S. Ct. at 1909.

¶ 34 This court has also analyzed issues surrounding courtroom closures. In *People v. Falaster*, 173 Ill. 2d 220, 226 (1996), we held that the trial court did not impermissibly close the courtroom when it ordered, pursuant to section 115-11 of

the Code of Criminal Procedure of 1963 (725 ILCS 5/115-11 (West 1992)), the removal of several spectators from the courtroom during the testimony of the 14-year-old victim of a sex offense. The defendant had argued that the trial court's order excluding spectators had to satisfy not only the requirements of section 115-11 but also the limitations established in *Waller* and *Press-Enterprise* for the closure of judicial proceedings to the press and public. *Falaster*, 173 Ill. 2d at 225-26. We disagreed and found those limitations did not apply where the trial court had complied with the requirements of section 115-11. *Id.* at 227-28. In so ruling, we noted that the persons who were temporarily excluded from the proceedings were not members of the defendant's immediate family and, thus, did not have a direct interest in the outcome of the case. *Id.* at 228. The trial court in *Falaster* also did not impose any restrictions on the media, who were still allowed access to the proceedings. *Id.* Consequently, we found that none of the evils of closed trials were implicated. *Id.*

¶ 35    Similarly, in *People v. Holveck*, 141 Ill. 2d 84, 101 (1990), we found that the defendant's right to a public trial was not violated where the trial court had closed the courtroom to spectators during the testimony of alleged child victims of sexual offenses. The victims' fathers and a psychologist were allowed to remain in the courtroom, and the media was also permitted to attend. *Id.* Although the trial court did not make a formal declaration of the reasons for closure, we found that the record demonstrated the reasons and that the trial judge had adequately balanced the necessary interests and factors before partially closing the courtroom. *Id.*

¶ 36    Essentially, in this case, defendant asks us to apply the same legal framework that would be applicable to review of a complete courtroom closure, over a defendant's timely objection. In contrast to *Waller* and the other cases he relies upon from the Court, he failed to object to the trial court's closure, which entailed a partial, not full, closure of the courtroom. As the State notes, under defendant's approach, a new trial would automatically be required whenever the trial court fails to strictly comply with the *Waller* factors before excluding any spectator from jury selection despite the lack of a contemporaneous objection. Defendant's faulty approach would be irrespective of the decision's impact on the fairness and openness of the proceeding, the reason for a defendant's lack of objection, and the fact that any possible error in partially closing the courtroom could have been cured had the defendant objected.

¶ 37    A contemporaneous objection is particularly crucial when challenging any courtroom closure. Defendant's arguments before us illustrate why. He criticizes the trial court for not making a more detailed finding of fact to support the closure and for not considering an alternative that would have allowed more members of the public to be present in the courtroom. Defendant fails to recognize that, if there is no objection at trial, there is no opportunity for the judge to develop an alternative plan to a partial closure or to explain in greater detail the justification for it. See *Weaver*, 582 U.S. at ___, 137 S. Ct. at 1912. This need to lodge a contemporaneous objection to a courtroom closure also prevents a defendant from potentially remaining silent about a possible error and waiting to raise the issue, seeking automatic reversal only if the case does not conclude in his favor. See *People v. Hampton*, 149 Ill. 2d 71, 100 (1992) ("defense counsel could secure a reversal simply by intentionally failing to object and, by design, depriving the trial court of the opportunity to prevent or correct the error").

¶ 38    We further note that the trial court's partial closure in this case did not occur in a vacuum without defendant's knowledge. The defense chose the family members who remained in the courtroom each day of jury selection. The trial court's decision to limit public access to the courtroom therefore required defendant's cooperation.

¶ 39    Here, defendant was charged with the murder of his two-year-old daughter. The trial court observed "emotions running high" due to the "nature of the case" when it determined that a partial closure was necessary. The trial court also expressed concern about the possibility of having to declare a mistrial if members of the public reacted or expressed emotion in a way that impacted the venire. See *Waller*, 467 U.S. at 46 ("The central aim of a criminal proceeding must be to try the accused fairly ***.") Additionally, the trial court was aware that this case would require a large venire in order to find a suitable jury and there were only so many seats in the courtroom. The trial was expected to last two weeks and was to begin prior to the Thanksgiving holiday. The parties had also listed approximately 50 potential trial witnesses.

¶ 40    Because of these considerations, the trial court, while recognizing defendant's right to a public trial, attempted to work out a solution. In doing so, the trial court allowed two family members who favored each side to remain in the courtroom during jury selection. The court also informed the prospective jurors that it had

granted a request for media coverage and specifically pointed out the camera in the courtroom. See *Holveck*, 141 Ill. 2d at 101 (holding that, by allowing the media to attend, the judge preserved the defendant's sixth amendment right to a public trial; the trial judge considered that the media presence is, in effect, the presence of the public). After jury selection was complete, the courtroom was open for the remainder of the trial.

¶ 41 The trial court's decision to partially close the courtroom did not call into question the confidence of the public in the integrity and impartiality of the court system. See *People v. Lewis*, 234 Ill. 2d 32, 48 (2009) ("Plain-error review focuses on the fairness of a proceeding and the integrity of the judicial process." (citing *Herron*, 215 Ill. 2d at 177)). Dozens of members of the venire who did not become jurors, along with the family members from each side who remained in the courtroom, were able to observe the selection process. They served as the eyes and ears of the public. There is no assertion that any juror lied or that the State or judge committed misconduct during jury selection, and there was a complete record made of the questioning that took place during the closure. See *Weaver*, 582 U.S. at ___, 137 S. Ct. at 1913.

¶ 42 Under these circumstances, we find the partial closure of the courtroom did not constitute clear or obvious error by depriving defendant of his sixth amendment right to a public trial. See *Waller*, 467 U.S. at 46 (recognizing that the right to a public trial helps to ensure a fair trial, reminds the State and judge of their responsibility to the accused and the importance of their functions, encourages witnesses to come forward, and discourages perjury); see also *Falaster*, 173 Ill. 2d at 227 (holding that none of the evils of a closed trial were implicated in the case). We therefore decline to excuse defendant's forfeiture.

¶ 43 II. Jury Instructions

¶ 44 Next, defendant contends that he was denied a fair trial because the trial court issued two jury instructions (Illinois Pattern Jury Instructions, Criminal, Nos. 11.29, 11.30 (4th ed. 2000) (hereinafter IPI Criminal 4th)), describing the mental state requirement for the offense of child endangerment as "willfully" rather than "knowingly."

¶ 45      Defendant did not object at trial or raise this issue in a posttrial motion. He claims, however, that the instruction's use of "willfully" in the absence of the clarifying instruction of IPI Criminal 4th No. 5.01B, was plain error. [3] Alternatively, he argues that his counsel provided ineffective assistance.

¶ 46      Rule 451(c) provides that "substantial defects" in criminal jury instructions "are not waived by failure to make timely objections thereto if the interests of justice require." Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013). This rule crafts a limited exception to the general rule to correct "grave errors" and errors in cases " 'so factually close that fundamental fairness requires that the jury be properly instructed.' " *Herron*, 215 Ill. 2d at 175 (quoting *People v. Hopp*, 209 Ill. 2d 1, 7 (2004)). Rule 451(c) is coextensive with the "plain error" clause of Illinois Supreme Court Rule 615(a), and we construe these rules identically. *People v. Downs*, 2015 IL 117934, ¶ 14.

¶ 47      Here, following IPI Criminal 4th Nos. 11.29 and 11.30, the trial court instructed the jury that defendant should be found guilty of child endangerment if the jury concluded, beyond a reasonable doubt, that he had care or custody over M.R., that he willfully caused or permitted M.R.'s life to be endangered, and that his acts proximately caused M.R.'s death.

¶ 48      In *People v. Jordan*, cited by defendant, this court held that "[a] person violates the child endangerment statute when he or she 'willfully cause[s] or permit[s] the life or health of a child *** to be endangered or *** willfully cause[s] or permit[s] a child to be placed in circumstances that endanger the child's life or health.' " 218 Ill. 2d 255, 270 (2006) (quoting 720 ILCS 5/12-21.6(a) (West 2002)). This court recognized that "[w]illful conduct is synonymous with knowing conduct." *Id.* Consequently, " '[c]onduct performed knowingly or with knowledge is performed willfully, within the meaning of a statute using the latter term, unless the statute clearly requires another meaning.' " *Id.* (quoting 720 ILCS 5/4-5(b) (West 2002)). Applying this holding, we concluded that a rational trier of fact could have found that the defendant knowingly endangered his infant daughter's life or health by leaving her unattended in a vehicle. *Id.*

---

[3]IPI Criminal 4th No. 5.01B, provides that "[c]onduct performed knowingly or with knowledge is performed willfully."

¶ 49 Six years later, the General Assembly amended the child endangerment statute, effective January 1, 2013, from "willfully" to "knowingly" causes or permits the life of a child to be endangered. See Pub. Act 97-1109, § 1-5 (eff. Jan. 1, 2013) (recodifying section 12-21.6 as section 12C-5); see also 720 ILCS 5/12C-5 (West 2014). However, at the time of defendant's offense, and subsequent indictment, the child endangerment statute provided, in relevant part, "[i]t is unlawful for any person to *willfully* cause or permit the life or health of a child under the age of 18 to be endangered." (Emphasis added.) 720 ILCS 5/12-21.6(a) (West 2010).

¶ 50 The trial court provided IPI Criminal 4th Nos. 11.29 and 11.30, which tracked the language of both the indictment and the statute governing the offense in this case. Neither instruction directs courts to give or to even see IPI Criminal 4th No. 5.01B. In *Jordan*, we did not hold that it is error to instruct the jury consistent with the statute or that a trial court must define "willfully" for the jury when no request is made. We simply recognized, as other courts had done, that "[w]illful conduct is synonymous with knowing conduct." *Jordan*, 218 Ill. 2d at 270. Because the trial court gave the pattern instructions, which did not require a definitional instruction on "willfully" and tracked the language of both the statute and indictment, the trial court did not commit clear or obvious error when instructing the jury.

¶ 51 Defendant similarly has not demonstrated that he received ineffective assistance of counsel because his attorney failed to challenge the instructions or ask for a clarification instruction. See *People v. Cherry*, 2016 IL 118728, ¶ 24 (holding that, to satisfy the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant must demonstrate ineffective assistance by showing that his counsel's performance was deficient and that this deficient performance prejudiced the defense). Simply put, defendant cannot show that his attorney's performance was deficient for failing to object to instructions that accurately stated the law and did not require a clarification instruction. See *People v. Dupree*, 2018 IL 122307, ¶ 44 (to satisfy the deficient performance prong of *Strickland*, a defendant must show that his counsel's performance was so inadequate that he was not functioning as the counsel guaranteed by the sixth amendment and, also, must overcome the strong presumption that any challenged action or inaction may have been the product of sound trial strategy).

¶ 52                                              CONCLUSION

¶ 53        For the reasons set forth above, we affirm the judgment of the appellate court affirming defendant's conviction and sentence.

¶ 54        Affirmed.

¶ 55        JUSTICE NEVILLE, dissenting:

¶ 56        Following a jury trial in the circuit court of Kankakee County, defendant Tavarius Radford was found guilty of felony child endangerment (720 ILCS 5/12-21.6(a) (West 2010)) and was sentenced to 42 months in prison. A divided panel of the appellate court affirmed. 2018 IL App (3d) 140404. Affirming the judgment of the appellate court, the majority holds that the trial court did not commit plain error by (1) excluding all but four members of the public from the courtroom during the entirety of prospective juror questioning (*supra* ¶¶ 22-42) and (2) failing to include in the jury instructions on child endangerment, a required instruction that clarifies the requisite mental state for the charged offense (*supra* ¶¶ 44-50).

¶ 57        The majority minimizes the legal impact of a trial court's deprivation of a defendant's constitutional right to a public trial. The majority overlooks the fact that members of the public also have a constitutional right to be present at a public trial. The majority misperceives precedent that has established relief when a court violates a defendant's constitutional right to a public trial. The majority also overlooks this court's clear mandate to give specified Illinois Pattern Jury Instructions when required. For the following reasons, I would reverse the judgments of the appellate and trial courts and remand the cause to the trial court for further proceedings. Therefore, I respectfully dissent.

¶ 58                                          I. BACKGROUND

¶ 59                                        A. Charged Offenses

¶ 60        Defendant was charged in an indictment with murder, involuntary manslaughter, and felony child endangerment. The indictment charged that

- 15 -

defendant caused traumatic head injuries to his 26-month-old daughter, M.R., resulting in her death. Defendant was 17 years old at the time he was alleged to have committed these offenses. The jury acquitted defendant of murder and involuntary manslaughter but convicted him of felony child endangerment.

¶ 61                                   B. *Voir Dire*

¶ 62        Jury selection took place on November 18 and 19, 2013. On the first day of jury selection and prior to the start of *voir dire* (the preliminary questioning of prospective jurors), the trial court *sua sponte* decided to close the courtroom to all members of the public except for "two individuals from the victim's family and two individuals from the defendant's family." During the two days of jury selection, the trial court failed to make any finding that (1) closure was justified by an overriding interest, (2) closure was no broader than necessary to protect that interest, and (3) the court considered reasonable alternatives to closure pursuant to *Waller v. Georgia*, 467 U.S. 39, 48 (1984).

¶ 63        Instead of considering the *Waller* factors, the trial court stated:

"What I'm gonna do during jury selection, it's gonna be difficult—it's a public proceeding, jury selection, but here's the problem. There's only so many seats, and I am going to allow during jury selection say two individuals from—I—I take the—the courtroom appears to be divided, okay, between perhaps people here in support of the defendant and individuals here more or less in—in—not in support of the defendant, and I will allow two individuals from the victim's family and two individuals from the defendant's family to be present during jury selection and there may not even be room for you, but you cannot talk to any particular—any jurors.

* * *

So at this time we're gonna bring the jurors up. I am going to clear the courtroom with the exception of the two people from each side * * *."

¶ 64        Prior to bringing the prospective jurors into the courtroom to begin their preliminary questioning, the trial court excluded all but four members of the public from the courtroom, stating:

- 16 -

"All right. Folks, at this time I'm gonna ask that with the exception—the very limited exception of those who are permitted to remain in the courtroom, I'm gonna ask that everyone else step out and make room for the jurors who are now coming in. Thank you very much."

Neither defendant nor his counsel objected to the trial court's exclusion of all but four members of the public from the courtroom during the questioning of prospective jurors.

¶ 65    Thirty prospective jurors were called for preliminary questioning. In the first panel of 14 prospective jurors, 4 were excused for cause, 6 were excused with peremptory challenges, and 4 were selected as jurors. In the second panel of 16 prospective jurors, 6 were excused for cause, 4 were excused with peremptory challenges, and 6 were selected as jurors. At the conclusion of the first day of jury selection, 10 jurors were selected and sworn.

¶ 66    On the second day, prior to bringing out the second panel of prospective jurors, the trial court reminded the members of the public sitting in the courtroom of its prior decision to exclude all members of the public from the courtroom, except for two people from each family, stating:

"I'm gonna limit it to two people for jury selection *** two individuals from—associated with the defendant's family, two individuals associated with the alleged victim's family can be in the courtroom."

¶ 67    Nineteen prospective jurors were brought into the courtroom. The trial court informed counsel and the prospective jurors that a "request" for media coverage of the court proceedings had been granted and pointed out a camera located in the courtroom. The trial court stated that the media was allowed to film and photograph the courtroom setting, the participants in the trial, and any persons who might be in the audience, but the media was not allowed to film or photograph the jurors.

¶ 68    After six prospective jurors were excused for cause or other reasons, jury selection proceeded with the remaining people in the jury pool. One juror was excused for cause, two jurors were excused by the State, an alternate juror was excused by the defense, and two jurors and three alternates were selected and sworn. After jury selection was completed, the trial court permitted the public,

family members, and spectators to reenter the courtroom.

¶ 69                                C. Evidence Presented at Trial

¶ 70      On October 26, 2011, at approximately 10 a.m., Kayleigh Reardanz found her daughter, M.R., unresponsive in the Bourbonnais apartment she and defendant shared with her grandparents, Cheryl and David Heather. Kayleigh's friends, Kimberly and Echo Brewington, were also living in the apartment.

¶ 71      By the time M.R. arrived at the hospital, she had fallen into cardiac arrest. Attempts to resuscitate M.R. were unsuccessful, and she died shortly after 11 a.m. Dr. Valerie Arangelovich, the forensic pathologist who performed M.R.'s autopsy, opined that her death was caused by blunt head trauma from child abuse, and M.R.'s death certificate stated that the manner of death was homicide due to child abuse.

¶ 72      Trial testimony was presented delineating M.R.'s medical history, which included several accidental falls where M.R. hit her head. Kayleigh testified that, shortly after M.R. was born in August 2009, she developed a blue sclera (the tough fibrous outer layer of tissue covering all of the eyeball except the cornea) and grew to be unusually large for a child her age. Her pediatrician believed these were symptoms of "osteogenesis imperfecta" (brittle bone disease) and recommended a blood test and consultation with a geneticist. After receiving M.R.'s blood test results, Kayleigh and defendant decided not to consult with a geneticist.

¶ 73      In January or February 2011, M.R. fell and hit her head while defendant was babysitting her. Defendant took M.R. to a hospital emergency room, where they were met by Kayleigh, who noticed a "knot" on M.R.'s forehead. M.R.'s computed tomography (CT) scans were negative, and she was discharged by the treating physician.

¶ 74      Kayleigh testified that weeks later, while her friend was babysitting, M.R. fell and "split her eyebrow open." Then, on Easter, M.R. slipped in Kayleigh's mother's bathtub and "busted her chin." On both occasions, M.R. was taken to the hospital emergency room for medical care and treatment.

¶ 75      In September 2011, M.R.'s pediatrician diagnosed her with mild anemia. On October 13, 2011, M.R. returned to her pediatrician due to a large rash on her chest.

- 18 -

Kayleigh also showed the pediatrician bite marks on M.R.'s arm where she had bitten herself. The pediatrician opined that M.R.'s self-harm stemmed from behavioral issues unrelated to the rash. Kayleigh testified that, after M.R.'s rash subsided, she and defendant decided not to take her for bleeding and bruising panels ordered by her pediatrician.

¶ 76 On October 22, 2011, four days before her death, M.R. and Kayleigh were outside playing when M.R. fell and hit her head on the pavement. According to Kayleigh, M.R. was chasing her, and she heard a "big bang" when M.R.'s head hit the ground. M.R. cried and told Kayleigh that the back of her head hurt. Kayleigh testified that she noticed some redness but did not notice any other signs of injury and did not take M.R. to the hospital. As a precaution, Kayleigh kept M.R. awake for at least one hour after her fall just in case she had a concussion.

¶ 77 Kayleigh and Echo gave conflicting testimony about whether M.R. suffered another fall one day or three days prior to her death. Describing the fall, Kayleigh and Echo testified that, during a tantrum, M.R. threw herself backward and hit her head on the parking lot pavement outside of their apartment complex. Echo heard M.R.'s head hit the pavement and said it was a "bad fall." M.R. complained of head pain but did not want anyone to touch the back of her head.

¶ 78 Kayleigh and Cheryl testified that later that night, while M.R. was getting her hair styled, she complained of pain in the back of her head. They examined her head but did not see any signs of injury. Kayleigh testified that these events occurred the day before M.R.'s death, while Echo claimed they occurred three days before M.R.'s death.

¶ 79 Kayleigh spoke with the police at the hospital and a second time days after M.R.'s death. During these conversations, Kayleigh did not disclose M.R.'s medical history or her prior falls because she believed that M.R. died from Sudden Infant Death Syndrome (SIDS). After the coroner informed Kayleigh and defendant that it had been determined that M.R. died from blunt force head trauma caused by child abuse, Kayleigh met with the police and informed them about M.R.'s medical history and about M.R.'s prior falls.

¶ 80 When defendant elected not to testify at his trial, the jury was allowed to view his videotaped police interview. Defendant was 17 years old at the time he was

arrested and interrogated by Detective Brett Bukowski. Detective Bukowski used the so-called "Reid Technique," which the trial court noted at sentencing was a controversial and coercive method of police interrogation in which the object is to convince the suspect that confessing is in the suspect's best interest. During the interrogation, Detective Bukowski lied to defendant by telling him the evidence showed that he committed an act of abuse that caused M.R.'s death. The officer suggested that defendant committed the act of abuse sometime within 24 hours of M.R.'s death.

¶ 81    Defendant told the officer that on the afternoon of the day before M.R.'s death, he tucked her into bed to take a nap. A few minutes later he checked on M.R. and discovered that, instead of sleeping, she was playing with a wooden unicorn plaque. Defendant became annoyed that M.R. was not sleeping and tucked her back into bed "kind of roughly." He grabbed M.R. by her arms and pushed her from a sitting position onto her back on the soft daybed. Defendant indicated that he was on his knees at the time and that he held onto M.R.'s arms the whole time.

¶ 82    Defendant demonstrated on a stuffed bear, but he told police that the demonstration did not accurately depict how he tucked M.R. into the daybed. Defendant told police that he did not believe M.R. could have been hurt or injured by the way he tucked her into the daybed.

¶ 83    Detective Bukowski then suggested that M.R. must have hit her head on some object behind the daybed. Defendant then speculated that M.R. "could have" hit her head on the wooden plaque but added that, if this occurred, it was accidental.

¶ 84    The jury also heard conflicting expert testimony regarding the manner of M.R.'s death. The experts agreed that the subdural injuries M.R. sustained were a direct cause of her death—they disagreed as to whether these injuries occurred within 24 hours of her death.

¶ 85    Dr. Arangelovich opined that M.R.'s death was caused by blunt head trauma from child abuse. Dr. Arangelovich observed subgaleal and subdural hemorrhages in the back of M.R.'s head. She testified that the accidental falls M.R. experienced prior to her death could have caused the subgaleal hemorrhages. However, the doctor opined that the subgaleal hemorrhages did not cause M.R.'s death—the fatal injury was the subdural hemorrhage, which she opined occurred within 24 hours of

M.R.'s death. Dr. Arangelovich opined that the subdural injuries occurred within 24 hours of death based on their color and lack of healing.

¶ 86 Dr. Shaku Teas, a forensic pathologist, found no signs of child abuse in M.R.'s autopsy record. Dr. Teas believed that M.R.'s head injuries were consistent with the accidental falls she experienced prior to her death and opined that the head injuries she sustained in those falls caused her death. Dr. Teas claimed it was impossible to determine when M.R. sustained her subdural injuries because Dr. Arangelovich failed to take blood and tissue samples from the periphery of the injuries where healing typically begins. Dr. Teas opined that the multiple signs of healing observed in the samples taken from the center of the subdural injuries indicated that the injuries' periphery would have likely shown additional signs of healing which would more accurately determine their age. Dr. Teas opined that M.R.'s subdural injuries were definitely more than 24 hours old when she died and that she sustained these injuries before defendant "roughly" tucked her into bed.

¶ 87                                D. Jury Instructions

¶ 88 At the close of the evidence, the trial court instructed the jury on the charged offenses. The trial court gave an instruction based on Illinois Pattern Jury Instructions, Criminal, Nos. 11.29, 11.30 (4th ed. 2000) (hereinafter IPI Criminal 4th) on child endangerment, which instructed the jury that "[a] person commits the offense of endangering the life or health of a child when he has the care or custody of a child and willfully causes or permits the life of that child to be endangered and such acts proximately caused the death of that child."

¶ 89 The trial court instructed the jury that in order to sustain the charge of endangering the life or health of a child, the State must prove the following three propositions beyond a reasonable doubt: (1) that defendant had the care or custody of M.R., (2) that he willfully caused or permitted the life of M.R. to be endangered, and (3) that his acts proximately caused her death. The trial court explained that the requisite mental state for the offense of child endangerment is satisfied if the State proved beyond a reasonable doubt that the defendant willfully caused or permitted the life of M.R. to be endangered.

¶ 90                         E. Jury Verdict and Sentence

¶ 91        The jury acquitted defendant of murder and involuntary manslaughter but
convicted him of felony child endangerment. At sentencing, it was noted that
defendant had no criminal history or prior arrests. The trial court sentenced
defendant to a 42-month prison term and credited defendant for time served
awaiting trial.


¶ 92                         F. Appellate Court Decision

¶ 93        Defendant filed a direct appeal. He argued that (1) the State failed to prove that
his actions proximately caused M.R.'s death or that he willfully endangered her
life; (2) the trial court violated his right to a fair trial when it instructed the jury with
an instruction for the offense of child endangerment that failed to include the third
paragraph of IPI Criminal 4th No. 5.01B, which provides that "[c]onduct performed
knowingly or with knowledge is performed willfully" or, in the alternative, his
counsel was ineffective for failing to object to the instruction; and (3) the trial court
violated his constitutional right to a public trial by excluding all but four members
of the public from the courtroom during the questioning of prospective jurors.

¶ 94        A divided panel of the appellate court affirmed. 2018 IL App (3d) 140404. The
court determined that (1) the evidence adduced at trial was sufficient to prove
beyond a reasonable doubt that defendant both proximately caused the death of
M.R. and that he possessed the requisite mental state at the time of the offense and
(2) no error was committed by the trial court when it instructed the jury on the
mental state for the offense of child endangerment. *Id.* ¶¶ 36-47.

¶ 95        Finally, the court determined that defendant forfeited his argument that his right
to a public trial was violated because he failed to object when the trial court
excluded all but four members of the public during jury selection. *Id.* ¶ 54. The
court further held that the claim was not reviewable as second-prong plain error
based on its finding that the partial closure of the courtroom amounted to a "trivial
closure" that did not implicate defendant's constitutional right to a public trial. *Id.*
¶¶ 55-60.

¶ 96 The dissenting justice disagreed with the majority's finding that the exclusion of all but four members of the public during jury selection was "trivial." *Id.* ¶¶ 73-74 (McDade, J., dissenting). The dissenting justice maintained that a "closure is not trivial when it occurs for the entirety of the *voir dire* proceedings." *Id.* ¶ 73.

¶ 97 The dissenting justice also maintained that the trial court's exclusion of all but four members of the public during the entirety of jury selection amounted to clear error, which was not "trivial" but constituted second-prong error. *Id.* ¶¶ 69, 73-77. According to the dissenting justice "an error occurred, enabling plain-error review because the trial court violated defendant's right to a public trial." *Id.* ¶ 74. The dissenting justice concluded that defendant was entitled to a new trial due to the trial court's violation of his constitutional right to a public trial. *Id.* ¶ 77.

¶ 98 Defendant appeals to this court. I note that defendant was sentenced in March 2014. Therefore, he could already have served his sentence. "However, the nullification of a conviction unquestionably may have important consequences to a defendant, whether or not the attendant sentence has been served. In such circumstances, the probability that a criminal defendant may suffer collateral legal consequences from a sentence already served precludes a finding of mootness." (Internal quotation marks omitted.) *People v. Brown*, 2013 IL 114196, ¶ 33; see *People v. Jordan*, 218 Ill. 2d 255, 263 (2006). Accordingly, because this juvenile defendant may suffer collateral legal consequences, we properly consider his appeal.

¶ 99                                    II. ANALYSIS

¶ 100 Before this court, defendant assigns two errors to the trial court. Defendant contends that the trial court violated his constitutional right to a public trial by excluding all but four members of the public from the courtroom during the entirety of prospective juror questioning. Defendant also contends the trial court denied him a fair trial by instructing the jury with an instruction for the offense of child endangerment that failed to include the definition of "willfully" provided in the third paragraph of IPI Criminal 4th No. 5.01B.

¶ 101 The State's threshold response is that defendant has procedurally defaulted both issues. The record shows that defendant failed to object at trial regarding each

alleged error and failed to include each issue in his posttrial motion. To preserve an issue for appellate review, a defendant must object both at trial and in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant acknowledges that he failed to preserve these issues for appellate review. Accordingly, these issues are procedurally forfeited. See, *e.g.*, *People v. Bannister*, 232 Ill. 2d 52, 76 (2008); *People v. Naylor*, 229 Ill. 2d 584, 592 (2008).

¶ 102 However, defendant seeks review by invoking the plain-error doctrine of Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967). The doctrine serves as a narrow and limited exception to the general rule of procedural default. *People v. Walker*, 232 Ill. 2d 113, 124 (2009). A reviewing court may address a forfeited claim when a clear or obvious error occurs and (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). "Under the second prong of plain-error review, prejudice to the defendant is presumed because of the significance of the right involved." *People v. Lewis*, 234 Ill. 2d 32, 47 (2009). Under both prongs of the plain-error doctrine, the burden of persuasion remains with the defendant. When a defendant fails to establish plain error, the reviewing court must honor the procedural default. *Naylor*, 229 Ill. 2d at 593.

¶ 103 The initial step in conducting a plain-error analysis is to determine whether error occurred at all, which requires a substantive review of the issue. *In re Samantha V.*, 234 Ill. 2d 359, 368-69 (2009); *Walker*, 232 Ill. 2d at 124-25. I now review the two issues presented for plain error.

¶ 104 A. Defendant Was Denied the Constitutional Right to Public Trial

¶ 105 Defendant contends that the trial court committed clear or obvious error by excluding the public, with the exception of four individuals, from the entirety of prospective juror questioning. Defendant further contends that this error was not trivial. Therefore, according to defendant, the trial court's error constitutes second-prong plain error. Defendant asks us to reverse his conviction and remand for

further proceedings.

¶ 106                    1. Did Clear or Obvious Error Occur?

¶ 107    Defendant contends that the trial court's exclusion of all but four members of the public from the courtroom during the entire questioning of prospective jurors (A) violated his right to a public trial guaranteed by the sixth amendment to the United States Constitution (U.S. Const., amends. VI, XIV) and (B) the right of the public to attend the trial guaranteed by the first amendment (U.S. Const., amend. I). Although defendant cites to our state constitutional public trial guaranty (Ill. Const. 1970, art. I, § 8), he does not offer any argument specifically addressed thereto. Accordingly, I consider only federal constitutional principles. See, *e.g.*, *People v. Nielson*, 187 Ill. 2d 271, 280 (1999). The standard of review for determining whether an individual's constitutional rights have been violated is *de novo*. *People v. Hale*, 2013 IL 113140, ¶ 15.

¶ 108            a. Courtroom Audience: The Power of Observation

¶ 109    Before discussing the constitutional recognition of the courtroom audience, I examine its important and distinct identity. As a noted scholar has explained that "[t]o protect the local criminal court audience is"

> "to recognize the power that can come from observation itself. Consider the effects that an audience can have on a routine criminal proceeding—for example, an arraignment or a plea allocution—at which no jurors are present. When community members gain access to a nontrial courtroom, their presence in court does not just affect the case that they are there to see. The effect of their presence in the courtroom can be to change the nature of the nontrial proceedings as well. Audience members watch the players in the courtroom; they react to what they see and hear ***. Most of all, they sit, look, and listen. Their presence can have a palpable effect on the speakers in the courtroom. Simply by sitting and listening, audience members have the potential to play out *** one of the central historical functions of observers in adjudication: 'denying the government and disputants unchecked authority to determine the social meanings of conflicts and their resolutions.'

The audience's power, born from its physical presence in the courtroom, is bolstered by its ability to act based on what it hears: not only through voting for district attorneys, sheriffs, and sometimes judges, but also by contributing to public discourse at local gatherings, protests, or even in casual conversations with neighbors. Witnessing local criminal justice policies at play in routine cases informs audience members' opinions about the efficacy and fairness of those policies. Those audience members can then engage in conversation and debate in informal settings—with family members, neighbors, co-workers, and even while waiting in line at the courthouse—that contribute to the flow of opinion in the 'wild' (that is, unregulated) public sphere. These informal methods of political participation are crucial if 'affected locals' are to have input into more formal political decisionmaking. Indeed, modern courtrooms are often the sole sites in which the public can witness the adjudication of disputes and thereby hold the state accountable for the ways in which it administers that adjudication. In these ways, the potential for audience empowerment through observation contributes to both the legitimacy and the overall fairness of proceedings.

The act of observing can also connect audience members to outside movements for social and legal change, including those movements that focus explicitly on local issues of policing, prosecution, and punishment. Some local movements recognize the political power that comes from courtroom observation; these movements include organizing initiatives that gather community members to attend court in support of young people accused of crimes and 'courtwatch' programs, volunteer networks that promote the prosecution of specific categories of crimes—often domestic violence—by following specific cases and attending court when those cases are on the calendar." Jocelyn Simonson, *The Criminal Court Audience in a Post-Trial World*, 127 Harv. L. Rev. 2173, 2182-83 (2014).

Further, it is recognized that a criminal courtroom audience is likely to be composed of people of color:

"Who are the members of the criminal court audience? They are people who wait in lines and fill courtrooms to watch the cases in which they or their friends, family, or community members appear as victims, defendants, or witnesses to

a crime. As such, they are more likely than not to be poor people, people of color, or both. Overwhelmingly, people arrested for crimes in the United States are poor people of color, predominantly African Americans and Latinos. Victims, too, disproportionately come from the same communities. In contrast, many affluent Americans and white Americans do not set foot in a criminal courthouse unless they are called for jury service or to act in a professional capacity. As a consequence, even in counties with majority-white populations, it is not surprising to walk into a local criminal courtroom and find an audience consisting overwhelmingly of individuals of color. To be sure, not every single audience member in every single courtroom is a poor person of color: some defendants, victims, and their supporters come from privileged backgrounds; the institutional press reports on particularly famous or sordid cases; school groups attend court to learn about the criminal justice system; and some courtwatching groups are made up of middle-class citizens who want to monitor the ways in which courts treat other groups. My contention, however, is that these are rare occurrences in state criminal courtrooms.

The criminal court audience on which I focus represents a constituency with a significant stake in the workings of the criminal justice system—they are there, after all, because they are personally affected by at least one case on the calendar. While they wait for that one case to be called, audience members also watch the other cases that come before the same judge: cases involving other people accused of crimes that occurred within their community. As many scholars have shown, crimes, arrests, and prosecutions affect not only individuals, but also entire communities. The 'affected locals' in the audience, then, are witnessing cases that not only affect their own lives, but also have acute effects on the common experiences they share with their neighbors. Moreover, attending and observing the adjudication of low-level criminal cases is, for many people, their most frequent form of interaction with the workings of their local government." *Id.* at 2185-86.


### b. Courtroom Audience Members Differ From Jurors and the Press

Asserting that the trial court's nearly total closure of the courtroom did not constitute second-prong plain error, the majority reasons: "Dozens of members of

the venire who did not become jurors, along with the family members from each side who remained in the courtroom, were able to observe the selection process. They served as the eyes and ears of the public." *Supra* ¶ 41.

¶ 112     The majority's rationalization misperceives the distinct identity of a courtroom audience and how it differs from that of a jury:

"These features of the audience's experiences stand in sharp contrast to the experiences of juries. Unlike audience members, jurors must be disinterested residents of the county—to be picked for a jury, they generally cannot have any familiarity with the parties or the circumstances of the incident in question. When deliberating, they are required to ignore any outside opinions about criminal justice policy and instead apply the law to the facts as instructed. The audience, in contrast, is made up of *interested* members of the community— individuals in attendance precisely because they care and know about at least one case on the day's calendar. The audience is permitted to relate what it sees and hears to its larger experiences and make connections to local policy decisions, while the jury—as well as the judge and the parties—must confine their statements and analyses to the case at hand.

In addition, while audiences contain many men of color and noncitizens, juries are unlikely to include substantial numbers of either population. This phenomenon occurs because, in addition to excluding noncitizens, the majority of states and the federal government ban from jury service anyone convicted of a felony, which excludes approximately thirty percent of African American men from jury service. Indeed, men are underrepresented on juries. Even for minorities allowed into the jury pool, evidence suggests that they are more likely to be eliminated from criminal jury panels, especially in serious or capital cases. The poor and the homeless are also unlikely to serve on juries due to permanent residence requirements. Moreover, because courts draw jury pools at the county level, venires themselves do not start out as representative of the neighborhoods within those counties that are most affected by criminal justice policies. In these ways, the criminal court audience has greater exposure to the criminal justice system, but less input into its governing laws and policies, than do jurors from more affluent neighborhoods in the same county.

Audience members are not asked to 'serve' as disinterested factfinders and communal representatives. Nor are they attracted to the courthouse by famous or newsworthy stories in the way that the institutional press is. Instead, audience members arrive at their local courthouse because of actual events in their communities that have affected them or their loved ones. Most audience members are not there by choice; they are there because they have been drawn into the criminal justice system in a way that may very well have been beyond their control. But, if they can get through the courtroom doors, they have an effect on the proceedings they witness and serve a series of functions that are directly related to democratic values." (Emphasis in original.) Simonson, *supra*, at 2189-90.

In summation:

"As long as there are arrests and prosecutions, the audience will not stop seeking entry into courtrooms, and they will not stop listening to what is said there. *** The courtroom is full of poor people and people of color who have been drawn into the criminal justice system as defendants, victims, and their families, neighbors, and supporters, but who have little input into the priorities and policies governing that system. If the system includes them in the courtroom and acknowledges their presence, then they can serve an important constitutional function in the absence of the jury." *Id.* at 2194-95.

¶ 113                          c. The Exclusion of the Courtroom Audience

¶ 114     Scholars recognize that "criminal court audiences are excluded from courtrooms across the United States. These practices of exclusion underscore and reinforce the political inequalities described above, interfering with audience members' ability to fulfill their constitutional role as democratic participants in routine criminal justice." *Id.* at 2190. "Physical exclusion also takes place when courthouse administrators follow a practice of excluding community members from courtrooms due to lack of space. *** This trend is repeated around the nation, usually accompanied by official statements regarding concerns with overcrowding and safety." *Id.* at 2192.

## d. Defendant's Constitutional Right to a Courtroom Audience

The unique identity and function of a criminal court audience is incorporated in constitutional law:

> "[T]he criminal court audience is not just normatively important; it is *constitutionally important*. The criminal court audience is protected by both the defendant's right to a public trial under the Sixth Amendment and the public's right to access criminal proceedings—the 'freedom to listen'—under the First Amendment. As a result, the audience can and should be a central constitutional mechanism for popular accountability in modern criminal justice." (Emphasis in original.) *Id.* at 2176.

The United States Supreme Court has explained that the right to a public trial is grounded "upon two different provisions of the Bill of Rights, both applicable to the States via the Due Process Clause of the Fourteenth Amendment." *Presley v. Georgia*, 558 U.S. 209, 211-12 (2010) (*per curiam*).

In *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501 (1984), the Court extended the first amendment right of the press and public to attend a criminal trial "not only to the trial as such but also to the *voir dire* proceeding in which the jury is selected." *Waller*, 467 U.S. at 44-45; see *Press-Enterprise*, 464 U.S. at 509 n.8 ("By contrast, the question we address—whether the *voir dire* process must be open—focuses on First *** Amendment values and the historical backdrop against which the First Amendment was enacted."); *Press-Enterprise*, 464 U.S. at 516 (Stevens, J., concurring) ("The constitutional protection for the right of access that the Court upholds today is found in the First Amendment, rather than the public trial provision of the Sixth."). "The public has a right to be present [at *voir dire*] whether or not any party has asserted the right." *Presley*, 558 U.S. at 214.

The Court in *Press-Enterprise* explained as follows:

> "The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known.

Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." (Emphasis in original.) *Press-Enterprise*, 464 U.S. at 508.

"Closed proceedings, although not absolutely precluded, must be rare and only for cause shown that outweighs the value of openness." *Id.* at 509. The Court described a "presumption of openness" that may be overcome only by "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Id.* at 510.

¶ 120                     e. Sixth Amendment Right of the Accused

¶ 121    In addition, the sixth amendment provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial ***." U.S. Const., amend. VI. This sixth amendment right is the right of the accused. *Presley*, 558 U.S. at 212. The Court in *Waller* concluded that " 'there can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public.' " *Id.* (quoting *Waller*, 467 U.S. at 46). Thus, under both the first and sixth amendments, the right to a public trial extends to the jury selection phase of trial, particularly the questioning of prospective jurors. *Id.* at 213.

¶ 122    "While the accused does have a right to insist that the *voir dire* of the jurors be public, there are exceptions to this general rule." *Id.* Supreme Court case law has clearly established:

"[T]he right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information. Such circumstances will be rare, however, and the balance of interests must be struck with special care." *Waller*, 467 U.S. at 45.

¶ 123                    f. Standards for Excluding the Public From a Criminal Trial

¶ 124          The majority fails to consider the *Waller* factors that are used to evaluate whether the public has been properly excluded from a jury trial. "*Waller* provided standards for courts to apply before excluding the public from any stage of a criminal trial[.]" *Presley*, 558 U.S. at 213. According to the Court's decisional law:

> " '[(i)] [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [(ii)] the closure must be no broader than necessary to protect that interest, [(iii)] the trial court must consider reasonable alternatives to closing the proceeding, and [(iv)] it must make findings adequate to support the closure.' " *Id.* at 214 (quoting *Waller*, 467 U.S. at 48).

The application of the four-factor "*Waller* test," also known as the "overriding interest test," must rebut "the presumption of openness." See *Press-Enterprise*, 464 U.S. at 510.

¶ 125          Applying these controlling fundamental principles to the case at bar, I would hold that the trial court committed clear or obvious error. In affirming the trial court's judgment, the appellate court misapprehended and misapplied these controlling and fundamental principles.

¶ 126          The appellate court erroneously maintained that the overriding interest test for public trial closure "is distinguishable from this case in two ways." 2018 IL App (3d) 140404, ¶ 57. First, the appellate court maintained that the overriding interest test did not apply here because defendant did not contemporaneously object to closure. *Id.* However, this reasoning begs the question of whether defendant's procedural default should be honored or excused based on plain error. Second, the appellate court concluded that "the trial court's partial closure was, according to the record, prompted by unusually large public attendance in this specific case." *Id.* However, this reason, by itself, in no way addresses, much less rebuts, the "presumption of openness" that attached to this criminal trial. *Press-Enterprise*, 464 U.S. at 510.

¶ 127          In support of the appellate court's decision, the State contends that the trial court's exclusion of all but four members of the public during the entire questioning of prospective jurors was not clear or obvious error. The State does not argue that

this exclusion satisfied *Waller*'s overriding interest test. Rather, the State urges this court to adopt another test specifically for partial closures and argues that the instant partial closure met that standard.

¶ 128    *Waller* did not distinguish between total and partial closure of criminal trials. A "total closure" involves excluding all spectators from the courtroom for some period, with only attorneys and court staff remaining. A "partial closure" involves excluding one or more, but not all, spectators for some period. *United States v. Simmons*, 797 F.3d 409, 413 (6th Cir. 2015); *State v. Turrietta*, 2013-NMSC-036, ¶ 16, 308 P.3d 964. Of course, "some partial closures might approach a total closure in practical effect." (Internal quotation marks omitted.) *Turrietta*, 2013-NMSC-036, ¶ 16.

¶ 129    Almost all federal courts of appeals have distinguished between the total closure of proceedings and situations in which a courtroom is only partially closed to certain spectators. *Simmons*, 797 F.3d at 413. "These courts reasoned that a less stringent standard was justified because a partial closure does not implicate the same secrecy and fairness concerns that a total closure does." *Woods v. Kuhlmann*, 977 F.2d 74, 76 (2d Cir. 1992). Accordingly, these courts "modify the *Waller* test so that the 'overriding interest' requirement is replaced by requiring a showing of a 'substantial reason' for a partial closure, but the other three factors remain the same." *Simmons*, 797 F.3d at 414; see *Woods*, 977 F.2d at 77-78 (applying remaining three *Waller* factors).

¶ 130    However, several state courts have applied the *Waller* overriding interest test to partial closures of trials. See, *e.g.*, *Turrietta*, 2013-NMSC-036, ¶ 19; *Commonwealth v. Cohen*, 921 N.E.2d 906, 921 (Mass. 2010) (collecting cases). These courts reason that the difference between an "overriding interest" and a "substantial reason" "is not perfectly clear, other than the fact that the reviewing court knows that the 'substantial reason' standard is a more lenient standard than the 'overriding interest' standard." *Turrietta*, 2013-NMSC-036, ¶ 19. Further, these courts reason that *Waller*'s four-factor analysis "already contemplates a balancing of competing interests in closure decisions." *People v. Jones*, 750 N.E.2d 524, 529 (N.Y. 2001). "Therefore, if a reviewing court is already contemplating a partial closure, something less than a full closure, that analysis seems to already align with

the *Waller* standard's requirement that the closure be no broader than necessary." *Turrietta*, 2013-NMSC-036, ¶ 19.

¶ 131    Illinois courts have applied the *Waller* overriding interest test to partial closure situations. See, *e.g.*, *People v. Falaster*, 173 Ill. 2d 220, 225-28 (1996); *People v. Holveck*, 141 Ill. 2d 84, 100-03 (1990).

¶ 132    I observe that the majority cites *Falaster* and *Holveck* in upholding the trial court's erroneous exclusion order. *Supra* ¶¶ 34-35. However, the majority's reliance on those cases is misplaced. Those cases upheld partial closures under section 115-11 of the Code of Criminal Procedure of 1963 (see 725 ILCS 5/115-11 (West 1992); Ill. Rev. Stat. 1985, ch. 38, ¶ 115-11) to protect the overriding interest of preventing psychological trauma to minor victims testifying about being sexually assaulted. Those unique considerations were absent from defendant's jury selection. Further, in each of those cases, closure was ordered during the testimony of only one juvenile witness, while in this case closure was ordered during the examination of 49 potential jurors during a two-day period.

¶ 133                    g. Lack of Courtroom Seating Is Not Overriding Reason

¶ 134    The trial court's stated reason for the exclusion of all but four members of the public during the prospective juror questioning was simply a lack of courtroom seating. One court has declared that insufficient space may well provide a valid reason for the exclusion of the public during at least some part of prospective juror questioning when the number of prospective jurors in the jury pool are likely to fill all or almost all of the available seats (*Cohen*, 921 N.E.2d at 923), but "if space in the court room is or becomes available, the judge must make sure that members of the public who wish to observe the proceedings are not prevented from doing so" (*id.* at 924).

¶ 135    However, another court has flatly declared: "Mere courtroom overcrowding is not an overriding interest justifying courtroom closure ***." *People v. Floyd*, 988 N.E.2d 505, 507 (N.Y. 2013). A panel of our appellate court has observed:

        "We cannot help but note that the trial court's concern about space—that this particular courtroom did not have enough seating for even one member of

- 34 -

the public—will be true of every criminal case held therein which the trial court summons a large number of potential jurors and true for other similarly sized courtrooms. We cannot hold that a defendant may be denied the right to a public trial under these circumstances." *People v. Evans*, 2016 IL App (1st) 142190, ¶ 18.

Accord *Presley*, 558 U.S. at 215 (rejecting reasoning that permits closure of *voir dire* in every criminal case whenever the trial court would prefer to fill the courtroom with venirepersons rather than spectators).

¶ 136 I need not address the "substantial reason" test specifically for partial closures of criminal trials. The only difference between the substantial reason test and the overriding interest test is the eponymous first factor. In the case at bar, the record does not support the partial closure based on the second and third factors common to both tests. Regardless of whether available courtroom seating "is a compelling interest, only a substantial interest, or something less" (*In re G.B.*, 2018 COA 77, ¶ 31), the trial court's closure did not satisfy the closely connected second and third *Waller* factors. Courts of review will not render advisory opinions and ordinarily will not consider issues that are not essential to the disposition of the cases before them or where the results are not affected regardless of how the issues are decided. *Peach v. McGovern*, 2019 IL 123156, ¶ 64; *People v. Brown*, 236 Ill. 2d 175, 195 (2010).

¶ 137                             h. Trial Court's Exclusion Order Overly Broad

¶ 138 Contrary to the second *Waller* factor, the partial closure order here was broader than necessary. For example, the record shows that seating became available as prospective jurors were excused during the two days of jury selection. The order excluding all but four members of the public from the courtroom during the entirety of jury selection was too broad because it remained in effect even when the circumstances changed because seating became available when jurors were excused. See, *e.g.*, *Cohen*, 921 N.E.2d at 924.

¶ 139                    i. Trial Court Failed to Consider Other Reasonable Alternatives

¶ 140        Also, contrary to the third *Waller* factor, the trial court failed to consider reasonable alternatives to the exclusion of all but four members of the public from the courtroom during the entirety of the two-day jury selection. "[T]rial courts are required to consider alternatives to closure even when they are not offered by the parties" and "are obligated to take every reasonable measure to accommodate public attendance at criminal trials." *Presley*, 558 U.S. at 214-15. This obligation confers an affirmative duty on judges to ensure that members of the public are not unnecessarily excluded from courtrooms. See *State v. Davis*, 434 S.W.3d 549, 551 (Mo. Ct. App. 2014) (recognizing that neither the trial court in *Presley* nor in that case "proactively sought alternatives to closure"). The majority's *post hoc* rationalization of the trial court's courtroom closure (*supra* ¶ 39) cannot substitute for proper *Waller* findings by the trial court. See *Waller*, 467 U.S. at 49 n.8; *State v. Morales*, 2019 ND 206, ¶ 23, 932 N.W.2d 106 ("the *Waller* findings must be made *before* a closure. *** Neither we nor the trial court can satisfy the constitutional command with post-closure rationale for why the closure would have been justified if the court had made the required findings." (Emphasis in original.)). Finally, I note that potential jurors have no constitutional right to be present in the courtroom during jury selection.

¶ 141        "As a reviewing court, we can conceive reasonable alternatives—many of which are based in common sense." *Evans*, 2016 IL App (1st) 142190, ¶ 15. For example, one alternative would be keeping potential jurors in jury waiting rooms, sacred spaces reserved for jurors and not the public, until the potential jurors are to be questioned by the court and the attorneys. Another possibility could be reserving some seating for the public. See, *e.g.*, *Presley*, 558 U.S. at 215. As other courts have recognized, another possibility could be simply "dividing the jury venire panel to reduce courtroom congestion." *Id.*; see *In re Closure of Jury Voir Dire*, 516 N.W.2d 514, 516 (Mich. Ct. App. 1994) ("Further, the court gave no reason why every member of the jury pool had to be in the courtroom at one time. The court apparently did not even consider keeping some of the prospective jurors in jury rooms or other parts of the courthouse until it was determined that they were needed in the courtroom."). Further, if the trial court contemplated any additional reasons for excluding all but four members of the public from the courtroom during the

entirety of jury selection, or alternatives thereto, it did not make any findings for the record.

¶ 142    "[E]ven assuming, *arguendo*, that the trial court had an overriding interest in closing *voir dire*, it was still incumbent upon it to consider all reasonable alternatives to closure. It did not, and that is all this Court needs to decide." *Presley*, 558 U.S. at 216. I would hold that clear or obvious error occurred. Since this result obtains under either the overriding interest or the substantial reason test, I need not and do not consider adoption of the substantial reason test.

¶ 143                              2. Was the Error Trivial?

¶ 144    The trial court failed to apply the *Waller* analysis prior to ordering the exclusion of all but four members of the public from the courtroom during the entire two-day jury selection, and the appellate court failed to do so on review. Indeed, the appellate court failed to even mention *Presley* in its analysis of this issue. Because excluding all but four members of the public from the courtroom during the entirety of jury selection in the case at bar was unjustified (trial court failed to present overriding reason for closure or reasonable alternative to juror seating), the presumptive result under *Waller* is reversal of the conviction. See *id.* However, the appellate court cited *Peterson v. Williams*, 85 F.3d 39, 42 (2d Cir. 1996), for the proposition that "public trial violations are subject to a 'triviality standard.' " 2018 IL App (3d) 140404, ¶ 56. The appellate court held "that the trial court's partial closure during *voir dire* was trivial" and concluded that no clear error occurred in this case. *Id.* ¶ 60.

¶ 145    In *Peterson*, which the appellate court cited, the United States Court of Appeals for the Second Circuit explained that a triviality standard is "very different" from a harmless error inquiry because it does not dismiss a defendant's claim on the grounds that the defendant was "guilty anyway," or that the defendant was not prejudiced. Rather, a triviality standard looks to "whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant— whether otherwise innocent or guilty—of the protections conferred by the Sixth Amendment." *Peterson*, 85 F.3d at 42. The Second Circuit Court of Appeals subsequently explained that "it does not follow that every temporary instance of unjustified exclusion of the public—no matter how brief or trivial, and no matter

how inconsequential the proceedings that occurred during an unjustified closure—would require that a conviction be overturned." *Gibbons v. Savage*, 555 F.3d 112, 120 (2d Cir. 2009).

¶ 146    In *Waller*, the Supreme Court explained that the Sixth Amendment guarantee to a public trial furthered four values: (1) ensuring a fair trial, (2) reminding the prosecutor and judge of their responsibility to the accused and the importance of their functions, (3) encouraging witnesses to come forward, and (4) discouraging perjury. *Waller*, 467 U.S. at 46. Citing these values (*Peterson*, 85 F.3d at 43), the *Peterson* court held that the closure in that case, which was "extremely short" and "entirely inadvertent," did not infringe upon these values. *Id.* at 43-44. The Second Circuit Court of Appeals has explained: "Essentially, our analysis turns on whether the conduct at issue subverts the values the drafters of the Sixth Amendment sought to protect." (Internal quotation marks omitted.) *Gibbons*, 555 F.3d at 121.

¶ 147    In addition to the appellate court in this case, another panel of the appellate court has cited *Peterson* in support of a "triviality standard." See *People v. Jones*, 2014 IL App (1st) 120927, ¶ 42.

¶ 148    Before this court, defendant contends that a court may not deny a defendant relief on the ground that the exclusion of all but four members of the public from the courtroom during the entirety of jury selection was too trivial to violate the sixth amendment right to a public trial. I agree with defendant.

¶ 149    Initially, it must be remembered that this issue is presented in the context of second-prong plain error. This court has concluded as follows:

"Contrary to the appellate court, we do not believe a *de minimis* exception can be placed on plain error review. The exception would be difficult to implement because it would require declaring when the dispute becomes significant rather than *de minimis*. The question would necessarily arise as to where the line should be drawn. More importantly, a *de minimis* exception is inconsistent with the fundamental fairness concerns of the plain-error doctrine. Plain-error review focuses on the fairness of a proceeding and the integrity of the judicial process. [Citations.] An error may involve a relatively small amount of money or unimportant matter, but still affect the integrity of the judicial process and the fairness of the proceeding if the controversy is determined in an arbitrary or

unreasoned manner." *Lewis*, 234 Ill. 2d at 48.

¶ 150                    Public Trial Is a First and Sixth Amendment Right

¶ 151        It should be noted that a constitutional requirement of a public trial is not only based on a defendant's sixth amendment right but is also based on the public's first amendment right. Therefore, a determination that a closed proceeding does not infringe on a defendant's sixth amendment right to a public trial ignores and fails to address the "value of openness" that the first amendment guarantees to the public. *Press-Enterprise*, 464 U.S. at 508. *Waller*'s four-factor, overriding-interest test already balances the competing interests involved and allows closure where merited. For example, in *Press-Enterprise*, jury selection involved deeply personal or sensitive questioning of prospective jurors that may have caused embarrassment. The overriding interest in protecting the privacy of prospective jurors would have allowed the trial court to inform them in advance that they may make a request to discuss a matter *in camera* but with counsel present and on the record. *Id.* at 511-12. "Open justice is just too important to our constitution and our state to allow us to look for reasons to turn a blind eye to improperly locked courtroom doors." *State v. Easterling*, 137 P.3d 825, 834-35 (Wash. 2006) (*en banc*) (Chambers, J., concurring, joined by Owens and Sanders, JJ.). The *Waller* factors make it unnecessary to adopt a "triviality standard."

¶ 152        Additionally, "[e]ven if we were to indicate a tolerance for so called 'trivial closures,' the closure here could not be placed in that category." *Id.* at 831. In *United States v. Gupta*, 699 F.3d 682, 689 (2d Cir. 2012), the Second Circuit Court of Appeals distinguished *Peterson* as follows:

> "Whatever the outer boundaries of our 'triviality standard' may be (and we see no reason to define these boundaries in the present context), a trial court's intentional, unjustified closure of a courtroom during the entirety of *voir dire* cannot be deemed 'trivial.' "

The *Gupta* court explained as follows:

> " '[T]he value of openness' that a public trial guarantees 'lies in the fact that people not actually attending trials can have confidence that standards of

fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known.' [*Press-Enterprises*, 464 U.S. at 508.] Thus, the regularity of the proceedings is an important impression with which the courts should leave observers. While a public presence will more likely bring to light any errors that do occur, it is the openness of the proceeding itself, regardless of what actually transpires, that imparts 'the appearance of fairness so essential to public confidence in the system' as a whole. [*Press-Enterprises*, 464 U.S. at 508.]

Given the exceptional importance of the right to a public trial, excluding the public for all of *voir dire* without justification grounded in the record [citations] is not trivial. Indeed, to conclude otherwise would eviscerate the right entirely. Absent the triviality exception, reversal is required here because the district court failed to make *Waller* findings before excluding the public from the courtroom." *Id.*

¶ 153    The *Gupta* court concluded that "the importance of the public trial right dictates that, before closing a courtroom to the public, a trial court must inform the parties of its intentions and make explicit *Waller* findings. Failure to comply with this procedure will, in nearly all cases, invite reversal." *Id.* at 690.

¶ 154    In the case at bar, the trial court's exclusion of all but four members of the public from the courtroom during the entirety of the two-day jury selection was not inadvertent, brief, temporary, or inconsequential. See *id.* at 685. Because *Waller* makes it unnecessary to adopt *Peterson*'s "triviality framework," I conclude that the exclusion here clearly was not trivial. See, *e.g.*, *People v. Hassen*, 2015 CO 49, ¶ 17. I would hold that the trial court violated defendant's sixth amendment right to a public trial and the public's first amendment right to attend a criminal trial.

¶ 155                    3. Did the Error Constitute Second-Prong Plain Error?

¶ 156    I have concluded that the trial court clearly erred in excluding all but four members of the public from the courtroom during the entirety of the two-day jury selection. I must next consider whether defendant's procedural default of this issue

may be excused under the plain-error doctrine. Defendant argues that the trial court's clear error falls under the second prong of the plain-error doctrine.

¶ 157　　As earlier stated, under the second prong of the plain-error doctrine, a reviewing court may address a forfeited claim where the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. Prejudice to the defendant is presumed because of the importance of the right involved, regardless of the strength of the evidence. *Piatkowski*, 225 Ill. 2d at 565 (citing *Herron*, 215 Ill. 2d at 186-87).

¶ 158　　Further, it is quite established that constitutional errors are divided into two classes. One class is labeled "trial error," which is subject to harmless-error analysis. The other class of constitutional error, labeled "structural" error, affects the framework within which the trial proceeds and is not simply an error in the trial process itself. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006); *Neder v. United States*, 527 U.S. 1, 8 (1999). Under the Supreme Court's "traditional categorical approach to structural errors," "a constitutional error is either structural or it is not." *Neder*, 527 U.S. at 14. Structural errors are found in a very limited class of cases. *Id.* at 8.

¶ 159　　The Supreme Court has recognized three broad rationales for deeming an error to be structural. First, an error has been deemed structural where the right that was violated is not designed to protect the defendant from erroneous conviction but instead protects some other interest. Second, an error is deemed structural because of the difficulty in assessing the effect of the error. *Weaver v. Massachusetts*, 582 U.S. ___, ___, 137 S. Ct. 1899, 1908 (2017); see *Gonzalez-Lopez*, 548 U.S. at 149 n.4. Third, an error is structural if it infects the entire trial process and necessarily renders a trial fundamentally unfair. *Weaver*, 582 U.S. at ___, 137 S. Ct. at 1908; *Neder*, 527 U.S. at 8-9. Structural errors are so intrinsically harmful as to require automatic reversal without regard to their effect on the outcome. *Neder*, 527 U.S. at 7.

¶ 160　　Structural errors include the denial of the right to a public trial. *Gonzalez-Lopez*, 548 U.S. at 149; *Neder*, 527 U.S. at 8. This is so because

> "[u]nder the rubric of structural error, a courtroom closure that violates *Waller* is not subject to harmless error analysis because it would be extremely

difficult for a defendant to come up with evidence of specific injury resulting from an improper closure. After all, if the public is excluded from the courtroom it is difficult, if not impossible, to demonstrate how the presence of spectators would have deterred perjury, curbed judicial abuse, or advanced the cause of republican self-government." Daniel Levitas, Comment, *Scaling* Waller*: How Courts Have Eroded the Sixth Amendment Public Trial Right*, 59 Emory L.J. 493, 524-25 (2009).

¶ 161    Surprisingly, the majority asserts that the trial court's near-total closure of the courtroom did not constitute second-prong plain error. *Supra* ¶ 41. This assertion overlooks the Supreme Court's "traditional categorical approach to structural errors." *Neder*, 527 U.S. at 14.

¶ 162    Although this court has not restricted the second prong of our plain-error doctrine to the six types of structural error that have been recognized by the Supreme Court (*People v. Clark*, 2016 IL 118845, ¶ 46), we have equated second-prong plain error with "structural" error (*People v. Thompson*, 238 Ill. 2d 598, 613-14 (2010); *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009)). This court has likewise recognized that the denial of the right to a public trial is "structural" error. *Thompson*, 238 Ill. 2d at 609.

¶ 163    "When the constitutionally tainted portion of trial encompasses the entire jury-selection process, it has been almost universally held that relief involves a new voir dire and a new jury; perforce, it necessitates a new trial." *Steadman v. State*, 360 S.W.3d 499, 510 (Tex. Crim. App. 2012) (collecting cases). Our appellate court has so held. *People v. Willis*, 274 Ill. App. 3d 551, 553-54 (1995); *People v. Taylor*, 244 Ill. App. 3d 460, 468 (1993); see, *e.g.*, *Easterling*, 137 P.3d at 832 ("The denial of the constitutional right to a public trial is one of the limited classes of fundamental rights not subject to harmless error analysis. *** As a result, precedent directs that the appropriate remedy for the trial court's constitutional error is reversal *** and remand for new trial.").

¶ 164    In the case at bar, however, the appellate court relied on *Weaver*, 582 U.S. ___, 137 S. Ct. 1899, to conclude that the trial court's violation of defendant's right to a public trial did not result in automatic reversal. Again, the appellate court misapprehended the controlling principles. Indeed, *Weaver* itself introduces the issue presented in that case as follows:

"In the direct review context, the underlying constitutional violation—the courtroom closure—has been treated by this court as a structural error, *i.e.*, an error entitling the defendant to automatic reversal without any inquiry into prejudice. The question [presented] is whether invalidation of the conviction is required here as well, or if the prejudice inquiry is altered when the structural error is raised in the context of an ineffective-assistance-of-counsel claim." *Id.* at ___, 137 S. Ct. at 1905.

¶ 165     The defendant in *Weaver* raised the ineffective assistance of counsel claim not on direct review but in a state collateral postconviction proceeding. *Id.* at ___, 137 S. Ct. at 1906. The Supreme Court "retreated from its historical practice of uniformly treating a public trial violation as a structural error that presumes prejudice to the defendant. It concluded that a different approach was appropriate in instances where a defendant ties together public trial and ineffective assistance of counsel claims." *Williams v. Burt*, 949 F.3d 966, 977 (6th Cir. 2020) (discussing *Weaver*). The Supreme Court recognized that the right to a public trial is structural because it protects interests that do not belong to the defendant and because of the difficulty in assessing the effect of the error. *Weaver*, 582 U.S. at___, 137 S. Ct. at 1910.

¶ 166     However, the Supreme Court observed that a trial court may deprive a defendant of his or her right to an open courtroom by making proper *Waller* findings and that a public-trial violation can occur when the trial court omits to make proper *Waller* findings. Therefore, the Court reasoned that a public-trial violation does not always result in a fundamentally unfair trial. *Id.* at ___, 137 S. Ct. at 1909-10.

¶ 167     The Court then turned to the specific issue presented: "The question then becomes what showing is necessary when the defendant does not preserve a structural error on direct review *but raises it later in the context of an ineffective-assistance-of-counsel claim.*" (Emphasis added.) *Id.* at ___, 137 S. Ct. at 1910. The Supreme Court concluded that, "when a defendant raises a public-trial violation via an ineffective-assistance-of-counsel claim, *Strickland* prejudice is not shown automatically." *Id.* at ___, 137 S. Ct. at 1911. Rather, the defendant must show either a reasonable probability of a different outcome or that the particular public trial violation was so serious as to render the trial fundamentally unfair. *Id.* at ___,

- 43 -

137 S. Ct. at 1911. And in the specific posture of a collateral proceeding, in which the defendant seeks a second chance at a public trial claim, having passed on the claim once before, the defendant carries the burden to demonstrate prejudice. *Id.* at ___, 137 S. Ct. at 1913. That result strikes "the proper balance between the necessity for fair and just trials and the importance of finality of judgments." *Id.* at ___, 137 S. Ct. at 1913.

¶ 168 Citing *Weaver*, the majority chides defendant as follows: "Defendant fails to recognize that, if there is no objection at trial, there is no opportunity for the judge to develop an alternative plan to a partial closure or to explain in greater detail the justification for it." *Supra* ¶ 37 (citing *Weaver*, 582 U.S. at ___, 137 S. Ct. at 1912).

¶ 169 However, the majority fails to recognize that, because a violation of the right to a public trial is a structural error, it is regarded as second-prong plain error, which excuses the failure to make an objection. *Thompson*, 238 Ill. 2d at 609, 613-14; *Piatkowski*, 225 Ill. 2d at 565.

¶ 170 Further, the majority fails to recognize that the Supreme Court in *Weaver* expressed this rationale in the context of an ineffective-assistance-of-counsel claim on collateral review:

"The reason for placing the burden on the petitioner in this case, however, derives both from the nature of the error [citation] and *the difference between a public-trial violation preserved and then raised on direct review and a public-trial violation raised as an ineffective-assistance-of-counsel claim.* As explained above, when a defendant objects to a courtroom closure, the trial court can either order the courtroom opened or explain the reasons for keeping it closed. [Citation.] *When a defendant first raises the closure in an ineffective-assistance claim*, however, the trial court is deprived of the chance to cure the violation either by opening the courtroom or by explaining the reasons for closure." (Emphases added.) *Weaver*, 582 U.S. at ___, 137 S. Ct. at 1912.

The majority also fails to recognize that the trial court had the initial obligation to proactively seek alternatives to closure, even when they are not offered by the parties. See *Presley*, 558 U.S. at 214-15; *Davis*, 434 S.W.3d at 551.

¶ 171                          *Weaver* Does Not Apply

¶ 172        *Weaver* does not apply to this case. *Weaver* expressly limited its holding to
ineffective-assistance-of-counsel claims asserted in a postconviction proceeding.
*Weaver*, 582 U.S. at ___, 137 S. Ct. at 1905. This case is before us on direct review.
As the dissenting justice in the appellate court correctly noted: "The *Strickland* test
is not at issue in this case." 2018 IL App (3d) 140404, ¶ 76 (McDade, J., dissenting);
see *State v. Franklin*, 585 S.W.3d 431, 476 (Tenn. Crim. App. 2019) (the holding
in *Weaver* "is limited to post-conviction proceedings").

¶ 173        The majority's expansion of *Weaver* to this case overlooks the fact that the
violation of the right to a public trial has appropriately and historically been deemed
structural error. *Gonzalez-Lopez*, 548 U.S. at 149; *Neder*, 527 U.S. at 8. The right
to a public trial protects the rights of the public, the press, and the accused. *Waller*,
467 U.S. at 44-46. Also, it is difficult to assess the effect of a deprivation of the
right to a public trial. *Gonzalez-Lopez*, 548 U.S. at 149 n.4; *Waller*, 467 U.S. at 49
n.9. It should be noted that the demonstration of prejudice is a practical
impossibility. Indeed, it would be difficult to imagine a case in which a defendant
would have available evidence of specific injury. Therefore, to require that a
defendant demonstrate prejudice resulting from the violation of the right to a public
trial would in most cases deprive the defendant of the public-trial guarantee. *Waller*,
467 U.S. at 49 n.9 (and cases cited therein); *State v. Sams*, 802 S.W.2d 635, 641
(Tenn. Crim. App. 1990). Accordingly, I conclude that the trial court committed
structural constitutional error, which constitutes second-prong plain error.

¶ 174        The majority concludes its rejection of defendant's claim of a public trial
deprivation by declining to excuse defendant's forfeiture. *Supra* ¶ 42. However, the
rule of procedural default and forfeiture is an admonition to the parties, not a
limitation on the jurisdiction of this court. We may look beyond considerations of
waiver in order to maintain a sound and uniform body of precedent or where the
interests of justice so require. *In re Estate of Funk*, 221 Ill. 2d 30, 96-97 (2006);
*People v. Normand*, 215 Ill. 2d 539, 543-44 (2005); *People v. Wilson*, 155 Ill. 2d
374, 379 (1993). This is such a case.

¶ 175        The majority's avoidance of *Waller* is functionally unnecessary because

"*Waller*'s flexible test has the capacity to deal with all types of closures and exclusions of the public—trivial or serious, partial or total. *Waller*'s test would likely allow many of the trivial closures found unproblematic by lower courts, as long as trial and appellate courts go through the process of creating the record the Supreme Court has required. *Waller*'s test is much less rigid than the phrases 'structural error' and 'automatic reversal' portend, and avoiding the *Waller* test undermines a right at the center of our justice system." Kristin Saetveit, *Close Calls: Defining Courtroom Closures Under the Sixth Amendment*, 68 Stan. L. Rev. 897, 928 (2016).

¶ 176    The majority's avoidance of *Waller* also encourages trial court error in this area because

"redefining Sixth Amendment closures provides no incentive for trial judges to correctly apply *Waller* in future cases. Instead, it gives them an out from the Supreme Court's carefully calibrated test. Appellate courts are bending over backwards to avoid reversal, when, in actuality, retrials would encourage more consistent application of *Waller*'s test at the trial level. That, in turn, would reduce the frequency of these appeals and reversals, as trial judges would more often avoid violating the right in the first place. A fuller conception of *Waller*'s test would thus lead to a more unified doctrine, stronger protection of the right and more up-front consideration of countervailing concerns in particular cases." *Id.* at 931.

¶ 177    Accordingly, since a violation of a defendant's right to a public trial is a structural error (*Gonzalez-Lopez*, 548 U.S. at 149), I would excuse defendant's procedural default. I would reverse defendant's conviction and remand the case to the trial court for further proceedings.

¶ 178          B. Trial Court Erred by Failing to Give Required IPI Jury Instruction

¶ 179    Defendant's final contention concerns the jury instructions on child endangerment. Although I would reverse and remand for further proceedings, I will address this contention since it could recur on remand. Defendant maintains the trial court committed clear or obvious error by failing to instruct the jury using a

required paragraph of IPI Criminal 4th No. 5.01B, which clarifies the requisite mental state for the charged offense.

¶ 180　　Defendant concedes that he failed to preserve this issue for review but argues that this court may address it under the plain-error doctrine. Generally, no party may raise on appeal the failure to give an instruction unless he shall have tendered it. Ill. S. Ct. R. 366(b)(2)(i) (eff. Feb. 1, 1994). However, Illinois Supreme Court Rule 451(c) (eff. July 1, 2006) provides that substantial defects in jury instructions are not forfeited by a defendant's failure to make timely objections if the interests of justice require.

¶ 181　　"The purpose of Rule 451(c) is to permit correction of grave errors and errors in cases so factually close that fundamental fairness requires that the jury be properly instructed." *People v. Sargent*, 239 Ill. 2d 166, 189 (2010). Rule 451(c) is coextensive with the plain-error clause in Rule 615(a). *Bannister*, 232 Ill. 2d at 77. Therefore, before this court can address whether defendant's contentions satisfy the plain-error doctrine, we must first determine whether a clear or obvious error occurred. *People v. Downs*, 2015 IL 117934, ¶ 15.

¶ 182　　　　　　　　　　1. Did Clear or Obvious Error Occur?

¶ 183　　It is well established that the function of jury instructions is to provide the jury with the correct legal principles applicable to the evidence so that the jury may reach a correct decision according to the law and the evidence. *Bannister*, 232 Ill. 2d at 81. Although the giving of jury instructions is generally reviewed for an abuse of discretion, our standard of review is *de novo* when the question is whether the jury instruction accurately conveyed the applicable law. *People v. Pierce*, 226 Ill. 2d 470, 475 (2007).

¶ 184　　Defendant was charged with, among other crimes, felony child endangerment. The trial court instructed the jury in accordance with IPI Criminal 4th Nos. 11.29 and 11.30, which provided that one of the propositions the State was required to prove beyond a reasonable doubt was that defendant "willfully" caused or permitted the life of M.R. to be endangered.

¶ 185     The trial court, however, did not include an additional instruction defining the term "willfully." Specifically, the trial court did not tender the third paragraph of IPI Criminal 4th No. 5.01B, which provides that "[c]onduct performed knowingly or with knowledge is performed willfully." Defendant argues that the trial court erred in failing to instruct the jury with the definition of "willfully" provided in the third paragraph of IPI Criminal 4th No. 5.01B. I agree with defendant.

¶ 186     Defendant was charged with violating the former version of the child endangerment statute, which provided:

"It is unlawful for any person to willfully cause or permit the life or health of a child under the age of 18 to be endangered or to willfully cause or permit a child to be placed in circumstances that endanger the child's life or health ***." 720 ILCS 5/12-21.6(a) (West 2010).

¶ 187     In 2006, this court construed the term "willfully" in the statute to mean "knowingly." See *Jordan*, 218 Ill. 2d at 270 ("Willful conduct is synonymous with knowing conduct."). Effective January 1, 2013, prior to defendant's jury trial, the General Assembly amended the child endangerment statute. The legislature conformed the provision to *Jordan* by replacing the term "willfully" with the term "knowingly." Compare 720 ILCS 5/12-21.6(a) (West 2010), with 720 ILCS 5/12C-5(a) (West 2012); see Pub. Act 97-1109, § 1-5 (eff. Jan. 1, 2013).

¶ 188     At the time of defendant's jury trial, the child endangerment statute provided in relevant part:

"(a) A person commits endangering the life or health of a child when he or she knowingly: (1) causes or permits the life or health of a child under the age of 18 to be endangered; or (2) causes or permits a child to be placed in circumstances that endanger the child's life or health." 720 ILCS 5/12C-5(a) (West 2012).

¶ 189     In this case, the trial court erred by instructing the jury with a child endangerment jury instruction that did not accurately include the requisite mental state for this charged offense. The jury instruction failed to instruct the jury that the State was required to establish defendant's culpability by showing that he acted knowingly rather than willfully. And the error was compounded by the trial court's

failure to instruct the jury with the definition of "willfully" provided in the third paragraph of IPI Criminal 4th No. 5.01B.

¶ 190    The majority concludes that the trial court did not commit clear or obvious error when instructing the jury. The majority reasons: "The trial court provided IPI Criminal 4th Nos. 11.29 and 11.30, which tracked the language of both the indictment and the statute governing the offense in this case. Neither instruction directs courts to give or to even see IPI Criminal 4th No. 5.01B." *Supra* ¶ 50.

¶ 191    However, the committee notes to IPI Criminal 4th No. 5.01B provide that, when willfulness is an issue, the trial court is required to determine whether the statute using that term " 'clearly requires another meaning' " and, if so, the jury should be instructed accordingly. IPI Criminal 4th No. 5.01B, Committee Note, at 143. When the trial court instructed the jury on the elements of child endangerment, the term "willfully" clearly required another meaning, namely "knowingly." IPI Criminal 4th No. 5.01B. Our court has previously noted that, according to the user's guide to IPI Criminal 4th, " '[i]f a Committee Note indicates to give another instruction, that is a mandatory requirement.' " *People v. Hopp*, 209 Ill. 2d 1, 7 (2004) (quoting IPI Criminal 4th, User's Guide, at VIII). Therefore, since the trial court failed to give the jurors the proper instruction for the charged offense (720 ILCS 5/12-21.6(a) (West 2010)) and failed to follow the pattern instructions' definition of "willfully" (IPI Criminal 4th No. 5.01B), I would hold that clear or obvious error occurred.

¶ 192                    2. Did the Error Constitute Plain Error?

¶ 193    Since I have determined that the trial court erred by instructing the jury with the wrong child endangerment jury instruction that failed to include the definition of "willfully" as provided in the third paragraph of IPI Criminal 4th No. 5.01B, I must next determine whether this failure amounted to plain error. Defendant alternatively argues that the trial court's error falls under both the first and second prongs of the plain-error doctrine.

¶ 194    The State initially responds that the defendant's challenge to the trial court's alleged error regarding the child endangerment jury instruction is procedurally barred because he invited the alleged error by tendering or agreeing to the

instruction. A review of the instruction conference in the record does not support the State's claim.

¶ 195    Under the doctrine of invited error, where defense counsel tenders or agrees to a jury instruction, the defendant is estopped from challenging the propriety of that instruction on appeal. *People v. Parker*, 223 Ill. 2d 494, 508 (2006). In such circumstances, plain-error review is unavailable. *People v. Patrick*, 233 Ill. 2d 62, 77 (2009).

¶ 196    Here, the record shows that it was the State, not defense counsel, that tendered the jury instruction that included the term "willfully." Defense counsel did not request that the trial court use the term. Rather, defense counsel argued that the phrase "health of the child be injured" should not be included in the jury instruction. The parties and the trial court agreed that the phrase should be removed from the instruction. The fact that defense counsel voiced no objection to the modified instruction does not mean that she requested the trial court to use the term "willfully" in the instruction. Defense counsel simply failed to make an objection to the modified instruction, which does not constitute acquiescence.

¶ 197    The State next argues that, even if the trial court clearly or obviously erred by not defining the term "willfully" for the jury, the error did not render defendant's trial unfair under either the first or second prongs of the plain-error doctrine. Indeed, the State claims that defendant "benefitted" from the inherent ambiguity of the term because the jury could have understood "willfully" to mean more than "knowledge" and thereby held the State to a higher burden of proof than was required. I disagree.

¶ 198    This court's plain-error doctrine instructs us that "we are concerned with two ways in which the fairness of the defendant's trial can be compromised by unpreserved error." *Herron*, 215 Ill. 2d at 177. I conclude that the trial court's jury instruction error compromised the fairness of defendant's trial under both prongs of the plain-error doctrine.

¶ 199                          Evidence Closely Balanced

¶ 200    I would hold that the trial court's jury instruction error constituted plain error under the first prong of plain-error review because the evidence was closely

balanced as to whether defendant "knowingly" endangered M.R.'s life. In this case, in order to find defendant guilty of felony child endangerment, the jury was required to find beyond a reasonable doubt that he knowingly "caused or permitted the life of [M.R.] to be endangered" and that his actions proximately caused her death. In other words, the jury had to find that defendant knew at the time that he allegedly committed the charged conduct that this conduct endangered M.R.'s life.

¶ 201　　　However, in acquitting defendant of knowing murder and reckless involuntary manslaughter—criminal charges that were based on the same alleged conduct—the jury evidently determined that defendant did not knowingly or even recklessly cause M.R.'s death. In attempting to explain how the jury could have found defendant guilty of felony child endangerment while acquitting him of murder and reckless involuntary manslaughter, the trial court advanced the theory that this was an "eggshell skull" situation, where, although what defendant did would not have caused the death of a healthy child, his actions contributed to M.R.'s death because she was in a weakened state as a result of her prior falls. In addition, the prosecutor explained that it was his belief that "the jury *** did not believe that [defendant] throwing [M.R.] down on the bed was an act likely to cause death or great bodily harm" and that the jury found that defendant "didn't necessarily think he was doing anything that bad" when he performed the act in question.

¶ 202　　　Thus, it is evident from the comments of the trial court and prosecutor that the evidence was closely balanced as to whether defendant "knowingly" endangered M.R.'s life. The jury verdicts of acquittal on counts I and II (murder and involuntary manslaughter), in which the jury was properly instructed with the mental state terms for knowledge and recklessness, is evidence of the fact that defendant would not have been convicted of felony child endangerment if the jury had been properly instructed with the third paragraph of IPI Criminal 4th No. 5.01B, defining the term "willfully" as meaning "knowingly." I find that, with defendant's acquittal of murder and involuntary manslaughter, the evidence was so closely balanced that the trial court's failure to properly instruct the jury with the third paragraph of IPI Criminal 4th No. 5.01B threatened to tip the scales of justice against defendant. See *Piatkowski*, 225 Ill. 2d at 565.

¶ 203　　　Moreover, regardless of the closeness of the evidence, I find that the trial court's failure to properly instruct the jury with the third paragraph of IPI Criminal 4th No.

5.01B rose to the level of second-prong plain error. The State points out that our court has drawn a distinction between errors in failing to instruct on an essential element of a charged offense and errors in failing to define the mental state of a charged offense, and the State argues that the former may constitute second-prong error while the latter does not. *People v. Carlson*, 79 Ill. 2d 564, 583-84 (1980).

¶ 204    While I agree with the State that our court has drawn such a distinction, I disagree with the State's conclusion. Our court has determined that the erroneous omission of a jury instruction rises to the level of second-prong plain error when the omission creates a serious risk that the jurors incorrectly convicted defendant because they did not consider the correct mental state and, therefore, did not understand the applicable law so as to severely threaten the fairness of the trial. *Sargent*, 239 Ill. 2d at 190-91; *Hopp*, 209 Ill. 2d at 12.

¶ 205    For example, in *People v. Ogunsola*, 87 Ill. 2d 216, 222-23 (1981), our court determined that the trial court erred by instructing the jury with a modified jury instruction on deceptive practices that omitted any reference to the "intent to defraud." The court held that the mental state of intent to defraud was distinct and different from the mental state of knowledge. *Id.* at 221. The court added that the intent to defraud was an essential element of the offense of deceptive practices and that its "omission removed from the jury's consideration a disputed issue essential to the determination of defendant's guilt or innocence." *Id.* at 222-23. The court stated that "[t]he complete omission of an issue as central to the criminal trial as a part of the definition of the crime charged deprives the jury of the guidance it must have properly to decide the case." *Id.* at 223.

¶ 206    Similarly, in this case, the trial court instructed the jury with a child endangerment instruction that omitted the essential mental state element of the charged offense, namely knowledge. The error was compounded by the trial court's failure to properly instruct the jury with the third paragraph of IPI Criminal 4th No. 5.01B, defining the term "willfully" as meaning "knowingly." The trial court's omission prevented the jury from considering whether defendant "knowingly" endangered M.R.'s life, a mental state element essential to the determination of his guilt or innocence. See *id.*

¶ 207    Based upon the record before us, I find that defendant has satisfied his burden of establishing that the trial court erred when it gave the jury an instruction for the

offense of child endangerment that failed to include the definition of "willfully" provided in the third paragraph of IPI Criminal 4th No. 5.01B. The trial court's error constituted second-prong plain error because it created a serious risk that the jurors convicted the defendant of felony child endangerment due to their failure to be instructed with the proper mental state and this instruction error severely threatened the fairness of the trial. *Sargent*, 239 Ill. 2d at 191; *Hopp*, 209 Ill. 2d at 7-8. Accordingly, I conclude that defendant's conviction for felony child endangerment must be reversed.

¶ 208    In light of my conclusion, I need not address defendant's alternative contention that he was denied the effective assistance of counsel when his trial counsel failed to preserve this issue for review. See, *e.g.*, *In re Appointment of Special Prosecutor*, 2019 IL 122949, ¶ 68.

¶ 209    Lastly, I would find that the evidence, although close, was sufficient to prove defendant guilty beyond a reasonable doubt. This finding removes the risk of subjecting defendant to double jeopardy. See *People v. Manning*, 182 Ill. 2d 193, 218 (1998). By this finding, however, I would reach no conclusion as to defendant's guilt that would be binding on retrial. *Naylor*, 229 Ill. 2d at 611.

¶ 210                                III. CONCLUSION

¶ 211    The majority misapprehended the law when it failed to find that the trial court (1) violated defendant's sixth amendment right and the public's first amendment right to a public trial and (2) committed structural error when it excluded all but four members of the public from defendant's trial during jury selection. The majority also misapprehended the law when it failed to find that the trial court committed plain error when it failed to include in the jury instruction on child endangerment a required instruction that clarifies the requisite mental state for the charged offense and by doing so denied the defendant his right to a fair trial.

¶ 212    Moreover, this court has recognized its duty to work against implicit and unconscious bias in Illinois's courts by approving a mandatory implicit bias instruction. See Illinois Pattern Jury Instructions, Civil, No. 1.08 (rev. May 2019) (Implicit Bias) (hereinafter IPI Civil No. 1.08). The comment to the instruction explains in part as follows:

"The literature on implicit bias explains that everyone has implicit biases. This means that judges and jurors are not immune. *** It is particularly important for judges and jurors, who strive to be impartial decision-makers, to be aware of this phenomenon and to try to guard against it for purposes of the trial." IPI Civil No. 1.08, Comment (rev. May 2019).

In guarding against implicit bias, I think this court can and should take judicial notice of the fact that (1) Kankakee County, where this case was tried, is 70% white and 15% African American; (2) the juvenile mother of M.R., the decedent child, is white; (3) M.R. was mixed race; and (4) the juvenile defendant is African American. Based on (1) the aforementioned demographics, (2) the fact that the races of the defendant and the mother may have triggered the unconscious biases of the judge and jurors, and (3) my and the courts' obligation to ensure equal justice for all, I cannot excuse the trial court's closure of this juvenile African American defendant's trial during jury selection. In addition, I cannot affirm the conviction of this juvenile defendant with no criminal background when it is based on a verdict where the jury was not properly instructed with the correct mental state. Therefore, I respectfully dissent, and I would reverse the judgments of the appellate court and the circuit court of Kankakee County and remand the cause to the circuit court for further proceedings.

¶ 213    JUSTICE MICHAEL J. BURKE took no part in the consideration or decision of this case.